1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7

8             FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10    JUAN SARAVIA, individually and on
      behalf of all others similarly situated,
11                                                    No. C 14-05003 WHA
             Plaintiff,
12
         v.
13
                                                      **ORDER RE DEFENDANTS'**
14    DYNAMEX, INC., DYNAMEX FLEET                     **MOTION TO COMPEL**
      SERVICES, LLC, DYNAMEX                           **ARBITRATION AND**
15    OPERATIONS EAST, LLC, and                        **PLAINTIFF'S MOTION TO**
      DYNAMEX OPERATIONS WEST, LLC,                    **CONDITIONALLY CERTIFY**
16                                                    **COLLECTIVE ACTION**
             Defendants.
17    _____/

18                            **INTRODUCTION**

19          In this putative wage-and-hour collective action under the Fair Labor Standards Act,

20    plaintiff claims that he and other similarly-situated delivery drivers were misclassified as

21    independent contractors and thereby denied minimum wage and overtime pay.  Defendants

22    jointly move to enforce arbitration clauses in the agreements that form the basis for plaintiff's

23    claims.  Plaintiff moves for conditional certification of the collective action for the purpose of

24    facilitating notice.  For the reasons stated below, defendants' motion to compel arbitration is

25    DENIED, and plaintiff's motion for conditional certification is GRANTED IN PART AND DENIED

26    IN PART.

27

28

*United States District Court*
*For the Northern District of California*

**STATEMENT**

Plaintiff Juan Saravia is a native of El Salvador who lives in Richmond, California. Saravia speaks and reads Spanish, and speaks and reads only limited English. At all material times, Saravia operated a business that provided delivery services using trucks that he owned pursuant to contractual agreements with delivery logistics and brokering companies. Saravia ran his business with the assistance of several additional drivers and helpers, whom he paid directly. At first, Saravia ran his business as a sole proprietorship and used the fictitious business name "JJ Express." In 2009, he registered JJ Express as a limited liability company.

In 2010, defendant Dynamex Operations West, LLC, acquired an account that Saravia had been working on pursuant to a contract with a different company.[1] Dynamex did not, itself, own delivery vehicles as part of its business. Rather, it offered logistical consulting and warehouse management systems, and entered into contracts with "transportation service providers," such as Saravia, in order to provide transportation services to its clients (Tuggle Decl. ¶ 4).

Although Saravia may have been able to continue working on other accounts with the prior company, he elected to follow the work from that particular account to Dynamex West. He then entered into the first of three agreements to work out of the Hayward Branch of Dynamex West. That agreement was called an "Independent Contractor Operating Agreement." Saravia avers that a representative from Dynamex West presented the agreement to him without explaining its contents and simply directed him where to sign and fill in information. Saravia did not ask for a copy of the 2010 agreement in Spanish or ask to take an opportunity to have the agreement translated, but Dynamex did not offer to give him an advance copy either. Saravia says he signed quickly because he believed other drivers might be vying for the same work, although he was never told that such pressure existed (Saravia Dep. at 101). He was given a copy of the agreement after it was executed but never had it translated (*id.* at 100–03). Because

---

[1] In addition to Dynamex West, Saravia has named as defendants Dynamex, Inc., Dynamex Operations East, LLC, and Dynamex Fleet Services, LLC as defendants (collectively "Dynamex"), although his contractual relationship was with Dynamex West only.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

the 2010 agreement was not in effect during the applicable limitations period, it is not at issue in this litigation except to the extent it informs the interpretation of subsequent agreements.

In 2011, Saravia executed a second "Independent Contractor Operating Agreement" with Dynamex West. He avers that a representative of Dynamex West called him into the office during a work day, that presented him with the agreement in English, and directed him to the locations on the agreement to initial and sign. Although the representative from Dynamex West who presented the agreement to Saravia spoke some Spanish, Saravia did not ask the representative to explain any of the provisions, nor did he take any opportunity to have the agreement translated. No one presented Saravia with a copy of the agreement before he signed it, although Saravia never asked for one. Saravia's only understanding of the substance of the 2011 agreement was that "once [he] signed it, [he] would continue to keep on working" and that he needed to renew his 2010 agreement (*id.* at 109–14).

In 2012, Saravia sought to expand his business with Dynamex West by including a second truck, to be driven by his brother (*id.* at 115). The parties dispute whether Saravia asked someone at Dynamex whether he could expand or whether Dynamex pressured him to expand, but Saravia undertook the expansion in order "to see if [he] could get more money" (*id.* at 126). George Chin, a Dynamex representative, claims that he met with Saravia and his bilingual helper, Rudy Santa Maria, and explained that expansion involved multiple steps including obtaining proof of JJ Express's Federal Employee Identification Number from the Internal Revenue Service, obtaining additional liability insurance, and converting the contractual relationship to one between JJ Express and Dynamex West, rather than between Saravia and Dynamex West (Chin Dep. at 52, 55–56). Chin recalls meeting with Saravia numerous times throughout that multi-step process. Saravia only recalls meeting with Chin once, and he insists he was alone at that meeting. Nevertheless, Saravia does not dispute that he had to fill out several forms and provide certain information in order to bring in his second truck, or that the process took several months before his second truck was approved for use by Dynamex (Saravia Dep., Exhs. 20, 25).

3

Several weeks after Saravia began this process, he executed a "Transportation Services Master Agreement" (Tuggle Decl., Exh. B). Chin presented that agreement to Saravia in an electronic form displayed on a computer monitor and scrolled through the agreement. Chin prompted Saravia to sign the agreement using a stylus on an electronic pad. Saravia received no copy of the agreement until after he signed it. Although Chin avers that he had a practice to read the terms of an agreement out loud to the person executing it, he does not specifically recall doing so for Saravia (Chin Dep. at 84–87).

Dynamex terminated its relationship with Saravia in 2012. Saravia claims "they fired [him] because [he] refused to do another route after 5:00 p.m." (Saravia Dep. at 116). The tax documents that Saravia has produced demonstrate that he earned more than $120,000 per year, although that does not account for the expenses that he was personally responsible for, such as paying his helpers and drivers and maintaining his vehicle (Saravia Dep. at 139–41, Exh. 26). Saravia has not kept good records of his expenses, but his tax documents show that his actual net earnings were between $30,000 and $50,000 per year (Konecky Decl., Exh. 7).

Saravia seeks to represent a collective action of delivery drivers whom Dynamex has classified as independent contractors. Dynamex enters into agreements with individuals and companies, which it calls "transportation service providers." Those agreements govern the terms on which the transportation service providers work with Dynamex's clients. Although the transportation service providers operate according to numerous different business models from sole proprietors to corporations with five or more vehicles, the agreements are all based on templates. Certain terms in the agreements based on those templates, such as pay scale and the specific category of delivery services provided varied from service provider to service provider. The templates themselves have also changed over time, notably including an overhaul in 2013, although the 2013 agreement has not rolled out in Massachusetts or California, where statewide class actions are already pending. Nevertheless, many of the substantive terms are consistent.

Pursuant to these agreements, drivers all have the same basic duties of performing local deliveries according to the terms and logistics set by Dynamex. Drivers generally use Dynamex's proprietary mobile tracking application in order to communicate with Dynamex's

1   central dispatching for information such as routing.  They are subject to a similar set of

2   deductions from their income in order to pay certain expenses.  All of the agreements classified

3   transportation service providers as independent contractors and did not provide benefits such as

4   overtime or minimum wages (Leveridge Dep. 34, 69, 105, 186, 246; Saravia Decl. ¶¶ 16–19;

5   Santos Decl. ¶ 17; Valdez Decl. ¶ 16).

6       Dynamex moves to enforce arbitration clauses in Saravia's 2011 and 2012 agreements

7   and to stay the litigation pending an arbitrator's determination of the arbitrability of the

8   underlying claims.  Saravia moves to conditionally certify the collective action in order to

9   facilitate notice.  This order follows full briefing and oral argument on both motions, as well as

10  limited discovery and supplemental briefing pertaining to whether the parties intended to

11  delegate the issue of arbitrability to arbitration.

**ANALYSIS**

13  **1.    DYNAMEX'S MOTION TO COMPEL ARBITRATION.**

14      Defendants' motion to compel arbitration is governed by the Federal Arbitration Act.

15  9 U.S.C. 1, *et seq*.  The FAA requires the resolution of two "gateway" issues:  (1) whether a

16  valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the

17  dispute at issue.  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002).  If a valid

18  arbitration clause exists, arbitration is mandatory unless the party resisting arbitration can prove

19  a defense to enforcement of the agreement, such as unconscionability.  *Pinnacle Museum Tower*

20  *Association v. Pinnacle Market Development (US), LLC*, 55 Cal. 4th 223, 235 (2012).

21      Each of the three agreements between Saravia and Dynamex West included arbitration

22  provisions.  The provisions in the 2010 and 2011 agreements were identical.  They provided

23  (Tuggle Decl., Exh. A ¶ 19):

24          All disputes and claims arising under, out of, or relating to this
            Agreement . . . including the arbitrability of disputes between the
25          parties, shall be fully resolved by arbitration in accordance with
            Texas's Arbitration Act and/or the Federal Arbitration Act.  Any
26          Arbitration between the parties will be governed by the
            Commercial Arbitration Rules of the American Arbitration
27          Association ("the Rules").  The parties specifically agree that no
            dispute may be joined with the dispute of another and agree that
28          class actions under this arbitration provision are prohibited. . . .
            The place of the arbitration herein shall be Dallas, Texas. . . .  The

United States District Court
For the Northern District of California

> parties agree that the arbitration fees shall be split between the parties, unless CONTRACTOR shows that the arbitration fees will impose a substantial financial hardship on CONTRACTOR . . . .

The 2012 agreement provided (*id.*, Exh. B ¶ 27):

> In the event of any dispute that may arise between the parties regarding services and performance hereunder, and as a condition precedent to any other remedy herein, the parties agree to:
>
> A.  Initially, and as soon as practicable, meet and confer with each other . . . ;
>
> B.  In the event that such voluntary efforts are not successful in resolving the dispute, submit the matter to arbitration in accordance with the Texas Arbitration Act and/or the Federal Arbitration Act.  Any Arbitration between the parties will be governed by the Commercial Arbitration Rules of the American Arbitration Association ("the Rules").  The parties specifically agree that no dispute may be joined with the dispute of another and agree that class actions under this arbitration provision are prohibited.  . . .  The place of the arbitration herein shall be Dallas, Texas.  . . .  The parties agree that the arbitration fees shall be split between the parties.

Each of the three agreements also included choice-of-law provisions designating Texas law.

Saravia's claims are based on the 2011 and 2012 agreements (the 2010 agreement was not in effect within the applicable statute of limitations period).  Dynamex moves to enforce the arbitration provisions in the 2011 and 2012 agreements.

### A.  Choice Of Law.

Although the Federal Arbitration Act governs the enforcement of an arbitration clause, such enforcement may be defeated by defenses to the enforcement of a contract.  Saravia contends that the arbitration provisions in the 2011 and 2012 agreements are unenforceable because they were unconscionable.  Thus, substantive contract law applies to Saravia's opposition to the enforcement of the arbitration provisions in those agreements.

Both the 2011 and the 2012 agreements included choice-of-law provisions applying the substantive law of Texas to those agreements (Tuggle Decl., Exh. A ¶ 17; Exh. B ¶ 24).  A district court applies the choice-of-law principles of the state in which it sits.  *Bassidji v. Goe*, 413 F.3d 928, 933 (9th Cir. 2005).  Under California law, a contractual choice-of-law provision should be enforced if:  (i) the chosen state's law has a "substantial relationship" to the parties or

6

United States District Court

For the Northern District of California

the transaction, (ii) the forum state has no "fundamental policy" that is inconsistent with the chosen state's law, and (iii) even if such a fundamental conflict exists, the provision should nevertheless be enforced unless the forum state has a "materially greater interest" in the resolution of the matters at issue. *In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057, 1069 (9th Cir. 2001). The parties agree that the first prong is met because Dynamex West is headquartered in Texas. *See Peleg v. Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425, 1445–46 (2012).

As to the second prong, there are several material differences between California and Texas law pertaining to the enforceability of the arbitration provisions at issue here. California public policy holds that the imposition of substantial forum fees is grounds for invalidating an arbitration agreement, even though such fees could be overturned through judicial review, while Texas law finds an arbitrator's ability to shift costs is sufficient to protect a party's rights. *Compare Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 110 (2000), *with In re Poly-Am., L.P.*, 262 S.W.3d 337, 357 (Tex. 2008). Similarly, California law does not permit enforcement of arbitration agreements even after multiple defects have been severed because such an agreement "indicate[s] a systematic effort to impose arbitration . . . as an inferior forum that works to the employer's advantage." *Armendariz*, 24 Cal. 4th at 124. By contrast, Texas law would enforce such a provision as long as "the parties would have entered into the agreement absent the unenforceable provisions." *D.R. Horton-Texas, Ltd. v. Drogseth*, 2013 WL 3377121, at *4 (Tex. App., July 3, 2013). In light of these differences, this order finds that Texas law conflicts with fundamental aspects of California's substantive law pertaining to unconscionability. *Douglas v. U.S. Dist. Court for Cent. Dist. of California*, 495 F.3d 1062, 1067 (9th Cir. 2007). Furthermore, this order finds that California has a materially greater interest than Texas in adjudicating this dispute inasmuch as plaintiff is located in California, and the agreements at issue were executed and performed in California, while Texas's only interest in the dispute arises out of the fact that one of the defendants is headquartered there. *Id.* at 1067, n.2. Accordingly, California law governs Saravia's defenses to the enforcement of the arbitration provisions in the 2011 and 2012 agreements.

**B.      Whether The Court Can Decide Arbitrability.**

United States District Court
For the Northern District of California

The determination of whether an arbitration clause is valid, applicable, and enforceable is reserved to the district court unless "the parties clearly and unmistakably provide[d] otherwise," such as by delegating the issue of arbitrability to arbitration. *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649 (1986).  Even if a delegation of arbitrability is clear and unmistakable it may be found unenforceable if the delegation *itself* is unconscionable. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 71–74 (2010).  Dynamex contends that both the 2011 and the 2012 agreements clearly and unmistakably delegated the issue of arbitrability to an arbitrator.

The 2011 agreement expressly committed all disputes "including the arbitrability of disputes between the parties" to arbitration (Tuggle Decl., Exh. A ¶ 19).  Saravia does not contest that this is a clear and unmistakable delegation of arbitrability to arbitration.  The 2012 agreement, however, did not include such an express delegation clause.  Instead, that agreement incorporated the Commercial Arbitration Rules of the American Arbitration Association.  Rule 7(a) of the AAA rules provides, "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, and validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."  That agreement also included a severability clause that contemplated the possibility that a court, rather than an arbitrator, could determine arbitrability:  "Should any part of this Agreement for any reason be declared by any court of competent jurisdiction to be invalid . . ." (Tuggle Decl., Exh. B ¶ 25).

"[V]irtually every circuit to have considered the issue has determined that incorporation of the [AAA rules] constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability," at least where the parties are sophisticated. *Oracle America, Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013).  Our court of appeals has not resolved whether such a delegation can be clear and unmistakable even where one party is not sophisticated.

This order need not resolve whether incorporation of the AAA rules is clear and unmistakable on these facts, however, as it finds that the delegation clauses in both the 2011 and 2012 agreements were unenforceable.  Under California law, a delegation clause must be both

8

procedurally and substantively unconscionable in order to be found invalid, though the agreements are evaluated on a sliding scale, which disregards the need to show procedural unconscionability in proportion to the harshness of the substantive terms. *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal. 4th 83, 114 (2000). "In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Ibid.* Because a delegation clause is severable from a broader arbitration provision, it must be found unconscionable independent of the other substantive terms of an arbitration provision. *Rent-a-Center*, 561 U.S. at 71–74. This order finds that even the delegation provisions were procedurally and substantively unconscionable as applied to Saravia.

*(1)     Procedural Unconscionability.*

Procedural unconscionability refers to oppression or surprise. *Armendariz*, 24 Cal.4th at 114. Oppression is shown by "an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice." *Flores v. Transamerica HomeFirst, Inc.*, 93 Cal. App. 4th 846, 853 (2001). Unfair surprise relates to "the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms. *Armendariz*, 25 Cal. 4th at 114.

Both the 2011 and 2012 agreements were form contracts, nearly identical to those presented to other drivers at the same time, that Saravia was tersely instructed to sign. The agreements were written in English although Dynamex knew that Saravia's comprehension of English was limited. Saravia received the agreements on the day they were to be executed, not sooner, and he was given no opportunity to re-negotiate any provisions. Dynamex never provided Saravia with a copy of the AAA rules that were to govern any arbitration pursuant to these agreements (and that form the sole basis for delegating arbitrability under the 2012 agreement). Even if, as Dynamex contends, Saravia could have sought to negotiate the terms of either agreement, including any agreement to delegate arbitrability, without adversely affecting his employment, the circumstances of the execution of those agreements were so oppressive that any such opportunity was meaningless.

United States District Court

For the Northern District of California

1    Moreover, this order finds that the delegation clauses in the 2011 and 2012 agreements

2    constituted an unfair surprise exacerbating the procedural unconscionability.  Nothing in the text

3    of the agreements called Saravia's attention to the dispute resolution provisions.  Those

4    provisions were formatted identically to the rest of the provisions in the arguments, and they lay

5    buried in the middle of more than ten pages of mostly boilerplate language.  No one at Dynamex

6    explained any provision of the agreement to Saravia, much less explained the significance of the

7    rights affected by the delegation or arbitration provisions.  It is true that Saravia could have had

8    his copy of the 2010 agreement translated before executing the 2011 agreement, which included

9    similar terms, but nothing alerted Saravia to the fact that any terms deserved a special degree of

10   attention, which would have prompted him to seek a translation.  The 2012 agreement contained

11   very different language (and served a different purpose overall) from the prior agreements, so

12   such a translation may not have even put Saravia on notice of the arbitration clause therein,

13   much less the effect of incorporation of the AAA rules.

14       This order finds that Dynamex presented the delegation provision in the 2011 agreement

15   and the incorporation of the delegation provision in the AAA rules in the 2012 agreement to

16   Saravia in an oppressive manner and those provisions constituted unfair surprises in the

17   respective agreements, all amounting to procedural unconscionability.

18                      *(2)      Substantive Unconscionability.*

19       The Supreme Court has held that a party resisting a delegation clause cannot defeat that

20   clause with a challenge directed only to the agreement as a whole, since the delegation clause

21   would be severable from that agreement.  *Rent-A-Center*, 561 U.S. at 72.  Nevertheless, even if

22   the issue of arbitrability was delegated to resolution through arbitration, that limited proceeding

23   would still be subject to certain place and manner provisions in the agreement.  Thus, this order

24   considers the substantive fairness of those provisions and finds they were unconscionable as

25   applied to Saravia.

26       Substantive unconscionability concerns how one-sided a bargain is.  *Armendariz*, 24 Cal.

27   4th at 114.  A delegation clause that lacks mutuality without a reasonable justification is

28   sufficient to find unconscionability.  *Id.* at 117–18.

United States District Court
For the Northern District of California

1    Both of Saravia's 2011 and 2012 agreements with Dynamex agreements require that any

2 arbitration proceedings, including those assessing the arbitrability of Saravia's claims, occur in

3 Dallas, Texas, and that those proceedings will be governed by the AAA rules.  Although Saravia

4 resides over a thousand miles from Dallas, Dynamex West's headquarters are located in Dallas.

5 Our court of appeals has found that designating a forum "so prohibitively costly to [a plaintiff]

6 that [he would be] precluded from participating in the proceeding," such as designating Boston,

7 while the plaintiff lives in California, is unenforceable, particularly in light of procedural

8 unconscionability.  *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1289 (9th Cir. 2006).

9    Dynamex claims that Saravia was earning over $120,000 per year through his business at

10 the time he executed either of the 2011 or 2012 agreements, so he cannot claim that the cost of

11 travel and lodging in Texas or the opportunity cost for days spent not working would be a

12 hardship.  Yet, Dynamex does not dispute the fact that Saravia's actual net income must account

13 for the significant expenses he had to pay from that gross sum, including paying his own helpers

14 and substitute drivers.  Thus, this order finds, particularly in light of the procedural

15 unconscionability discussed above, the designation of Dallas as the forum for arbitration,

16 including pertaining to arbitrability, is unconscionable, as it would require Saravia to incur a

17 prohibitive cost in order to enforce his rights under those agreements.

18    Moreover, both agreements required Saravia to pay half of the arbitral fees.  "[W]hen an

19 employer imposes mandatory arbitration as a condition as employment, the arbitration agreement

20 or arbitration process cannot generally require the employee to bear any type of expense that the

21 employee would not be required to bear if he or she were free to bring the action in court."

22 *Armendariz*, 24 Cal. 4th at 110–11.  Here, even to resolve the question of arbitrability, Saravia

23 would be responsible for substantial filing fees, final fees, and costs such as arbitrator

24 compensation, which he would not face in court.

25    Finally, Saravia would face the possibility of having to pay attorney's fees to Dynamex if

26 he lost at arbitration, even as to the limited issue of arbitrability.  Saravia would not face such a

27 risk if he is permitted to vindicate his rights to be free from an unconscionable contract in court.

28    Under California law, the presence of multiple unconscionable provisions in an

United States District Court
For the Northern District of California

arbitration clause suggest that the overall intention of the arbitration agreement was to force employees into unfair arbitration. *Armendariz*, 24 Cal. 4th at 124–25. Severing the unenforceable provisions of an arbitration clause (or as here, a delegation clause) would allow an employer to draft one-sided agreements and then whittle down to the least-offensive agreement if faced with litigation, rather than drafting fair agreements in the first instance. Multiple aspects of the delegation clause are problematic, and curing any of those problems would require redrafting that clause. This order finds, in light of the multiple aspects of procedural unconscionability presented by the execution of both agreements, those bases for substantive unconscionability are sufficient to render the delegation clause of the 2011 agreement and the incorporation of the AAA rules in the 2012 agreement unenforceable. Thus, the issue of arbitrability must be decided by the Court.

### C.      Whether The Arbitration Clause Is Enforceable.

The same bases for finding the delegation clauses procedurally and substantively unconscionable, discussed above, apply to the broader arbitration clauses in Saravia's 2011 and 2012 agreements. Additionally, a fee-shifting provision, although not per se unconscionable, may be unenforceable as contrary to public policy if it "impedes the vindication" of unwaivable statutory rights, such as rights under the FLSA. *Nagrampa*, 469 F.3d at 1285. The FLSA itself provides for an award of attorney's fees to a prevailing plaintiff in order to insure effective access to the judicial process, but the arbitration provisions in the 2011 and 2012 agreements both entitle the prevailing party to recovery attorney's fees regardless of whether the party is the plaintiff or the defendant. This order finds that the imposition of these fees are effective deterrents to Saravia's pursuit of his rights against Dynamex under the FLSA and further demonstrate the substantive unconscionability of arbitration in this context. Thus, the arbitration clauses in Saravia's agreements with Dynamex are unenforceable. Dynamex's motion to compel arbitration and stay this action is hereby **DENIED**.

### 2.      SARAVIA'S MOTION TO CONDITIONALLY CERTIFY COLLECTIVE ACTION.

### A.      Conditional Certification.

United States District Court

For the Northern District of California

1    Saravia has moved for conditional certification of the proposed collective action in order

2  to facilitate notice to the potential members of the collective.  Collective actions under the FLSA

3  are governed by Section 216(b) of the United States Code, which provides, in relevant part:

4    An action to recover the liability prescribed in either of the
     preceding sentences may be maintained against any employer

5    (including a public agency) in any Federal or State court of
     competent jurisdiction by any one or more employees for and in

6    behalf of himself or themselves and other employees similarly
     situated. No employee shall be a party plaintiff to any such action

7    unless he gives his consent in writing to become such a party and
     such consent is filed in the court in which such action is brought.

8
  Neither the FLSA nor our court of appeals has defined "similarly situated," within the context of

9  the FLSA.

10    District courts have significant discretion in implementing Section 216(b) to facilitate

11  notice to potential opt-in plaintiffs.  *Hoffman-La Roche v. Sperling*, 493 U.S. 165, 169 (1989).

12  A majority of district courts in our circuit employ a two-step approach to collective actions.

13  *E.g.*, *Leuthold v. Destination America, Inc.*, 224 F.R.D. 462, 466–67 (N.D. Cal. Aug. 16, 2004)

14  (Judge Vaughn Walker).  In the first step of this approach, the issue is whether the putative

15  collective should be given notice of the action.  This determination "is usually made under a

16  fairly lenient standard and typically results in conditional class certification."  *Ibid.*  The second

17  stage occurs when discovery is complete and the case is ready to be tried.  The party opposing

18  collective certification may then move for decertification.  *Ibid.*

19    Because the instant action is in the first stage, this order will not address the factors

20  needed to determine the propriety and scope of the collective action during the second stage.

21  Certification is called "conditional" during the first stage because the opposing party could

22  always (successfully) move for decertification.  At this stage, district courts simply evaluate

23  whether there is "some factual basis beyond the mere averments in their complaint for the class

24  allegations."  *Adams v. Inter-Con Sec. Sys., Inc.*, 242 F.R.D. 530, 536 (N.D. Cal. Apr. 11, 2007)

25  (Judge Marilyn Patel).

26    This order finds that Saravia has met this lenient standard.  Saravia has submitted

27  evidence that the delivery drivers had similar duties in that they performed local deliveries to

28  Dynamex's customers pursuant to terms negotiated by Dynamex.  They signed agreements that

13

United States District Court
For the Northern District of California

1    classified them as independent contractors, had no specific end date, and did not include

2    overtime or minimum wage protections.  Finally, the drivers were responsible for paying many

3    of their own expenses.  Those similarities are supported not only by Saravia's own declaration

4    and the terms of his agreements with Dynamex, but also on the deposition testimony of

5    Dynamex's 30(b)(6) witness and the declarations of several opt-in plaintiffs.  Those similarities

6    demonstrate that there is some factual basis for Saravia's collective-wide allegations that

7    Dynamex misclassified its delivery drivers as independent contractors and improperly denied

8    them minimum wages and overtime pay.

9            Notwithstanding these similarities, Dynamex argues that there are numerous material

10   differences among the service providers that would be covered by Saravia's proposed definition

11   and that conditional certification is inappropriate.  Specifically, Dynamex points out that even

12   agreements that followed the same template as Saravia's included different pay structures, such

13   as a straight commission, a per-route fee, or some combination of the two (Tuggle Decl., Exhs

14   A–D).  Furthermore, Dynamex points out that it overhauled the template for its agreements with

15   drivers in 2013 (including an opt-out provision for the arbitration clause and altering the timing

16   and requirements for termination, among other substantive differences), although Saravia's

17   relationship with Dynamex was terminated before it rolled out that template.  The 2013 template

18   is now in place across Dynamex's footprint, with the exception of Massachusetts and California.

19   Similarly, many of the standard operating procedures that Saravia contends governed all

20   Dynamex delivery drivers were not in place until after Saravia's termination, and some of them

21   only applied to drivers subject to certain state or federal regulations.  Finally, Dynamex contends

22   that its over five thousand transportation service providers operate according to a wide variety of

23   business models from part-time sole proprietors to multi-vehicle corporations, and that many of

24   them bear "Hallmark Characteristic[s] of Bona Fide Independent Contractor Status" such as

25   accepting work from competitors, having the right to decline assignments, and utilizing their

26   own employees and subcontractors (*e.g.*, Fisher Decl. ¶ 3; Pippen Decl. ¶ 2l McCaffery Decl. ¶

27   3; Carson Decl. ¶ 13; Walter Decl. ¶¶ 4–5).

28

Dynamex claims that conditional certification is inappropriate in light of these differences between Saravia and many of the transportation service providers he seeks to represent. Dynamex notes that the determination of whether an individual is an independent contractor is a many-factor test that considers:

> (1) the degree of the alleged employer's right to control the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree of permanence of the working relationship; (6) whether the service rendered is an integral part of the alleged employer's business; (7) ownership of property or facilities when work occurred; and (8) whether responsibility under the contracts between a labor contractor and an employer passes from one labor contractor to another without material changes.

*Torres-Lopez v. May*, 111 F.3d 633, 646 (9th Cir. 1997). Thus, Dynamex argues, the determination of whether its delivery drivers were misclassified is a fact-intensive determination. Dynamex cites *Pfaahler v. Consultants for Architects, Inc.*, No. 99-cv-6700, 2000 WL 198888 (N.D. Ill., Feb. 8, 2000) (Judge Suzanne Conlon), for the contention that significant individual differences among members of a putative collective is fatal to conditional certification in a misclassification case. Although that decision denied conditional certification, that was because the plaintiff made no showing that the "potential claimants performed the same type of duties as himself, or that they could be classified as 'independent contractors.'" *Id.* at *2. The only similarities identified by the plaintiff therein were the number of hours worked, the procedures for interviews, and the system for paycheck disbursement, which were not probative of the nature of the putative collective members' employment, which was the touchstone of the collective allegations. Here, Saravia has provided substantial evidence of similarities among transportation service providers such as their duties, the degree of oversight, and the lack of overtime and minimum wage protections, all of which plainly do pertain to the nature of employment. That showing is sufficient at this phase.

In *Silverman v. SmithKline Beecham Corp.*, No. 06-cv-7272, 2007 WL 6344674 (C.D. Cal., Oct. 15, 2007) (Judge Dale Fischer), conditional certification was denied because the members of the putative collective worked in eight different business units that operated in

15

United States District Court

For the Northern District of California

1  different ways, and the plaintiff failed to provide any evidence that the alleged similarities were

2  common across the different business units.  Here, although Dynamex's transportation services

3  providers used different business models and pay structures, they performed the same duties,

4  they were all subject to agreements based on the same templates, they were all classified as

5  independent contractors, and they were subject to the same standard operating procedures.  This

6  is readily distinguishable from the facts in *Silverman*.  That decision is unpersuasive.

7       The remainder of the decisions that Dynamex cites were decided under the more stringent

8  standards of Rule 23 class actions or phase two of FLSA collective actions, not the lenient

9  standard applicable here.  Those decisions are inapposite to a motion to certify the collective at

10 phase one.

11      Dynamex also argues that even if Saravia can ultimately prove that the members of the

12 collective were misclassified, individualized issues of the extent, if any, of damages will still

13 need to be resolved.  In particular, some drivers may not have worked overtime at all, and yet

14 may be included in the collective.  Dynamex points out that the Supreme Court has granted

15 certiorari in *Tyson Foods v. Bouaphakeo*, 765 F.3d 791 (8th Cir. 2014), in which the dissenting

16 opinion expressed concerns about certifying a collective that included uninjured employees.

17 Even if the Supreme Court's grant of certiorari was persuasive authority, the Eighth Circuit's

18 decision pertained to a rejection of a motion to decertify at phase two of an FLSA action.  The

19 issue of whether the collective includes some members not entitled to damages is best resolved

20 at the second phase, with the benefit of discovery, not the lenient first phase.

21      One issue, however, is worth addressing at this phase, namely, the arbitration clauses in

22 each collective member's agreements with Dynamex.  Although this order determined that the

23 arbitration provisions in Saravia's agreements with Dynamex West were unenforceable, that

24 finding was based on facts that may have been unique to Saravia, such as Dynamex's knowledge

25 that he did not speak English and the terseness of the presentation of the agreements.  No district

26 court in our circuit has denied conditional certification on the basis that some members of the

27 proposed collective may be subject to valid and enforceable arbitration clauses.  The decisions

28 that have addressed that issue have all found that the issue of the enforceability of arbitration

1   clauses related to the merits of the case and therefore should be dealt with in phase two. *See*

2   *Shaia v. Harvest Management Sub LLC*, 306 F.R.D. 268 (N.D. Cal., Apr. 13, 2015) (Chief Judge

3   Phyllis Hamilton); *Deatrick v. Securitas Security Services USA, Inc.*, No. 13–cv–05016,

4   2014 WL 5358723 (N.D. Cal., Oct. 20, 2014) (Judge Jon Tigar); *Boyd v. Bank of America Corp.*,

5   No. 13-cv-0561, 2013 WL 6536751 (C.D. Cal., Dec. 11, 2013) (Judge David Carter).  So too

6   here.

7        Although this order only finds the delegation clauses and arbitration clauses unenforceable

8   as they applied to Saravia and given the procedure in which they were presented to Saravia, that

9   does not foreclose the possibility that those provisions would be found unenforceable for the

10   entire collective action, or for some segment of it.  Discovery may reveal a mechanism for

11   addressing the arbitration clauses on a collective-wide basis, such as by sub-dividing the

12   collective action based on the procedure by which the agreements were presented.  Thus, it

13   would be premature to assume that the issue of arbitration will be unmanageable at this phase,

14   rather than reserving it for a motion for decertification, as other courts have done.

15        Nevertheless, it is necessary to limit the scope of the collective action to account for the

16   challenge of dealing with the delegation and arbitration clauses on a collective-wide basis.

17   Accordingly, this order finds it is appropriate to certify a collective action only of those

18   transportation service providers that performed deliveries in California.  This limited scope will

19   ensure that the arbitration clauses are subject to only one state's laws, which will facilitate

20   collective-wide treatment.  Similarly, by limiting the scope of the collective to a smaller set of

21   Dynamex's locations, the differences among the company's treatment of delivery drivers will be

22   minimized.  Finally, because the 2013 template has not rolled out in California yet, the

23   differences between the provisions of that agreement and the agreements to which Saravia

24   agreed will not present further variations among the collective action.

25        Subject to that limitation, it is appropriate to conditionally certify the collective action for

26   the purpose of facilitating notice.

27           **B.   Form of Notice.**

28        Saravia seeks to notify the following drivers of this action, so that they may opt-in.

United States District Court

For the Northern District of California

> All individuals who have personally made one or more deliveries for Dynamex in the United States, and (1) whom Dynamex has purported to classify as an independent contractor through a written contract (the validity of which Plaintiffs challenge here); (2) whose vehicles used for the deliveries are registered in a Dynamex database accessible by Dynamex's Compliance Department; and (3) who make their deliveries out of an operating location at which Dynamex has a physical presence, at any time beginning three years before the filing of this Complaint.

> The collective action claims do not arise from deliveries unless a member of the collective personally made the delivery for Dynamex.

As noted above, the scope of this notice must be limited to those delivery drivers that performed deliveries in California. Dynamex has raised several objections to Saravia's proposed form of notice, but has not offered a counter-proposal. Dynamex asks for an opportunity to brief those issues more fully, as it focused its opposition brief on the issue of certification. Dynamex should have substantiated its arguments in its opposition to Saravia's motion. Saravia has also noted that he is open to meeting and conferring with Dynamex over submitting a joint proposed form of notice. This order addresses the objections to the extent they have been explained in Dynamex's brief.

Dynamex argues that the notice addresses "delivery drivers," which includes a broader set of individuals than the proposed definition of the collective action, specifically because it could be read to include employees and subcontractors of the entities that directly contracted with Dynamex, who were not parties to the independent contractor agreements. Subcontractors and employees of the entities who contracted with Dynamex are not similarly situated to Saravia, and the notice must be modified to more clearly draw that distinction.

Specifically, the preamble of the notice should be modified from "If you are or were a delivery driver for . . ." to "If you are or were a delivery driver pursuant to an independent contractor agreement with . . ." Under the section "What Are My Choices?" the proposed notice reads, "If you personally made one or more deliveries for Dynamex in the United States as an independent contractor . . ." That should be modified to read "If you personally made one or more deliveries for Dynamex in the United States pursuant to an independent contractor

1  agreement . . ."   The remaining references to "Delivery Drivers" are appropriate, inasmuch as

2  they are already sufficiently qualified by the surrounding language regarding misclassification.

3  Dynamex argues that the notice states that the suit was brought by "a group of current and

4  former Dynamex delivery drivers," rather than an individual former driver.  Dynamex is correct;

5  the proposed notice should be modified to accurately reflect the fact that the only lead plaintiff is

6  an individual former Dynamex delivery driver.

7  Dynamex argues that the footer on the proposed notice, which reads, "**NOTE** Return

8  the enclosed Consent to Join form as soon as possible if you wish to preserve your rights and to

9  be included in this case" misrepresents the effect of failing to opt-in.  Specifically, the footer

10 does not clarify that the only right forfeited by failing to opt-in is the right to join this particular

11 collective.  This order finds this footer is inappropriate and unnecessary and shall be removed

12 from the notice to the collective.  The footer shall be modified to read, "**NOTE*** Return the

13 enclosed Consent to Join form as soon as possible if you wish to be included in this case."

14 Dynamex argues that the opt-in period should be reduced from the ninety days proposed to

15 sixty days.  In light of the reduction in the scope of the collective action discussed above, the

16 opt-in period shall be reduced to sixty days.

17 Dynamex argues that the notice does not adequately put potential opt-in plaintiffs on notice

18 that they may ultimately be excluded from the collective if the arbitration provisions in their

19 agreements with Dynamex are enforceable or if the collective action is decertified for other

20 reasons.  The "Why Did I Get This Notice?" section already specifies that this order grants

21 "conditional certification."  That is sufficient to put potential opt-ins on notice that the collective

22 action may ultimately be de-certified.

23 The notice must, however, be modified to reflect the possibility that an opt-in plaintiff will

24 be compelled to arbitrate his or her claims.  The following shall be appended to the third bullet

25 point on the front page of the proposed notice, which describes Dynamex's position in the

26 litigation:

27        Dynamex also contends that any disputes relating to its
       independent contractor agreements must be resolved in arbitration,
28        rather than a court.  The Court has ruled against this position as to

19

the lead plaintiff Juan Saravia, but the issue will have to be litigated as to each opt-in.

The same language should be added to the end of the "What Is the Lawsuit About?" section.

Dynamex argues that the proposed notice does not adequately describe "discovery," when informing potential collective members that they may be subject to discovery. Specifically, Saravia's proposed notice reads:

> Your decision to submit a Consent to Join Form does not necessarily determine whether or not you will be required to participate in discovery during the case. Discovery might be taken from both those who submit a Consent to Join form as well as those who do not.

That sentence shall be modified to read:

> Your decision to submit a Consent to Join Form does not necessarily determine whether or not you will be required to submit evidence or provide testimony during the case. Evidence and testimony might be taken from both those who submit a Consent to Join Form as well as those who do not.

Finally, Dynamex argues that the notice should inform potential members of the collective that they may be subject to counterclaims and that any recovery may be offset by a pro rata share of counsel fees. The "What Happens If I Join?" section of the proposed notice shall be modified to include a notice of those possibilities. Dynamex did not offer any legal theory for its contention that members of the collective could be liable for its attorney's fees if the collective does not prevail. That is a scare tactic and should not be reflected in the notice.

By **OCTOBER 12**, Saravia shall file a new proposed form of notice consistent with this order, including the modifications discussed immediately above as well as the modifications limiting the collective action to only those delivery drivers that performed deliveries in California.

The parties shall meet and confer regarding the selection of a third party administrator and shall file a joint plan for distribution by **OCTOBER 26**. Notice shall be by first class mail and by e-mail and shall be sent by **DECEMBER 7**.

United States District Court
For the Northern District of California

20

**CONCLUSION**

For the reasons stated above, defendants' motion to compel arbitration is **DENIED**. Plaintiff's motion to conditionally certify the collective action is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED.**

Dated:   October 6, 2015.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE