.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN SARAVIA, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | No. C 14-05003 WHA |
| v. | |
| DYNAMEX, INC., DYNAMEX FLEET SERVICES LLC, DYNAMEX OPERATIONS EAST, INC., and DYNAMEX OPERATIONS WEST, INC., | **ORDER RE DEFENDANTS' MOTION TO DECERTIFY COLLECTIVE ACTION AND PLAINTIFFS' MOTION TO BIFURCATE** |
| Defendants. | |

## INTRODUCTION

In this conditionally certified action under the Fair Labor Standards Act, defendants move to decertify the collective action while plaintiffs move to bifurcate issues at trial into a collective misclassification phase and a separate individualized phase for the determination of liability and damages. For the reasons stated below, defendants' motion to decertify the collective action is **DENIED**, and plaintiffs' motion to bifurcate is **GRANTED**. This order also sets forth a new trial plan and continues the date of the trial.

## STATEMENT

Defendants Dynamex, Inc., Dynamex Fleet Services, LLC, Dynamex Operations East, Inc., and Dynamex Operations West, Inc., (collectively, "Dynamex") offered delivery logistics and brokering services with a focus on same-day services. Dynamex did not own or operate

delivery vehicles to perform the transportation services it offered. Instead, it contracted with numerous transportation service providers ("TSPs"), including plaintiff Juan Saravia and the more than one-hundred-fifty opt-in plaintiffs, to provide those services. The TSPs ranged from sole proprietors using their own vehicles to full-fledged businesses with numerous workers and vehicles.[1]

Dynamex required all TSPs to sign standardized agreements before beginning their work. The agreements uniformly required TSPs to pay for their own fuel, insurance, and expenses, to pay for additional insurance as part of a plan negotiated by Dynamex, and to follow Dynamex's standard operating procedures as well as the specific instructions provided for each individual transaction. Dynamex required TSPs to wear Dynamex uniforms, the cost of which it deducted from each TSP's earnings. Pursuant to the standardized agreements, Dynamex classified all TSPs as "independent contractors" and thus never paid overtime premium wages or guaranteed a minimum wage (Hart Decl., Exhs. 8–9).

Dynamex offered a variety of delivery services to a variety of customers, and TSPs could elect which categories of services to offer and in what proportion. Dynamex offered recurring deliveries, for which TSPs could accept regular shifts. TSPs could bid for various shifts and negotiate different payment schemes with Dynamex. Dynamex also offered TSPs on-demand deliveries, typically at a take-it-or-leave-it rate. On a given day, a TSP could perform a mix of recurring deliveries and on-demand deliveries, and he could arrange the optimal means for completing that work within the bounds of the assignment and depending on the drivers, vehicles, and equipment available at the time.

Some delivery assignments required TSPs to acquire specialized equipment, such as shipment of hazardous materials, while other assignments could be completed with a TSP's personal vehicle. Some TSPs built their businesses around on-demand deliveries, but others used them as a means to supplement their income from other delivery work or from an unrelated job. Similarly, some TSPs specialized in particular kinds of deliveries or offered additional

---

[1] Dynamex contends (as it has in each brief submitted in this action) that Dynamex Fleet Services and Dynamex Operations East are not proper defendants, inasmuch as they do not contract directly with TSPs. Neither defendant has moved to dismiss claims against it. This order need not address this issue.

2

1  services beyond their deliveries, while others rented different kinds of vehicles to maintain
2  flexibility.

3        TSPs had a degree of freedom to determine how to complete any work they accepted,
4  such as by performing the work themselves or by assigning the work to a second driver with a
5  separate vehicle.  Dynamex provided certain parameters (including timing and prior approval of
6  personnel), but TSPs remained free to arrange their work to maximize profit.  With that
7  freedom, some TSPs realized huge revenues by building out multi-vehicle businesses and others
8  did so by accepting work from multiple sources, of which Dynamex was just one.  With this
9  flexibility, some TSPs managed their business to the point that they only performed the actual
10 delivery work on an "emergency" or "overflow" basis, that is, when their other drivers could
11 not cover the entirety of the work.

12       Plaintiff Juan Saravia commenced this action in November 2014, contending he and his
13 business, JJ Express, LLC, had been misclassified as an "independent contractor" and seeking
14 minimum wages and overtime premium wages as an "employee."  Dynamex moved to compel
15 arbitration of Saravia's claims based on an arbitration clause in each agreement that Saravia
16 signed (either in his individual capacity or as a representative of JJ Express).  No decision has
17 directly addressed whether a corporate entity, rather than an individual, can be an employee
18 under the FLSA.  This order assumes, for the sake of argument, that a corporate entity can be
19 properly classified as an employee, at least to the extent the entity is an alter ego of an
20 individual.

21       After limited discovery regarding the circumstances of Saravia's apparent assent to the
22 agreement containing the mandatory arbitration clause, an order denied Dynamex's motion to
23 compel arbitration.  The same order conditionally certified the collective action pursuant to the
24 Fair Labor Standards Act for the purpose of facilitating notice to potential opt-in plaintiffs.

25       More than one-hundred-fifty TSPs opted in to the collective action.  The parties engaged
26 in an extensive and contentious discovery period, which closed on July 31.  Dynamex now
27 moves to decertify the conditionally-certified collective action.  Plaintiffs separately move to
28 bifurcate the case into a collective misclassification phase and an individualized liability and

damages phase. While this motion was pending, Dynamex moved to dismiss three sets of defendants. The order on that motion, which dismisses several defendants, is filed concurrently with this order. This order follows full briefing and oral argument.

**ANALYSIS**

Dynamex moves to decertify the collective action, contending that under the greater scrutiny applied at phase two of a collective action, the opt-in plaintiffs are not similarly situated. Plaintiffs oppose that motion and seek to bifurcate the issue of misclassification from the remaining issues in the case. This order denies Dynamex's motion and sets forth a trial plan.

Collective actions under the Fair Labor Standards Act are governed by Section 216(b) of Title 29 of the United States Code, which provides, in pertinent part:

> An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

Neither the FLSA nor our court of appeals has defined "similarly situated" within the meaning of the FLSA.

District courts in our circuit overwhelmingly apply a two-step approach to collective actions. *E.g.*, *Leuthold v. Destination America, Inc.*, 224 F.R.D. 462, 466–67 (N.D. Cal. 2004) (Judge Vaughn Walker). In the first step of this approach, the issue is whether the putative collective should be given notice of the action. This determination "is usually made under a fairly lenient standard and typically results in conditional class certification." The second stage occurs when discovery is complete and the case is ready to be tried. The party opposing collective certification may then move for decertification. At the latter stage, "the court must then make a factual determination regarding the propriety and scope of the class and must consider the following factors: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations." *Ibid.*

4

Our plaintiffs met the "lenient standard" of the first phase, and an order conditionally certified a collective action; however, under the FLSA, the "sole consequence of conditional certification is the sending of court-approved written notice to [alleged] employees . . . who in turn become parties to a collective action only by filing written consent with the court." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. ___, 133 S. Ct. 1523, 1530 (2013). Now, after discovery has closed, our plaintiffs bear the burden of demonstrating that they are indeed similarly situated with regard to the critical facts and legal issues in our case.

The central issue to be tried is whether Dynamex properly classified its TSPs as independent contractors or if it should have classified some or all of them as employees. Our court of appeals requires us to understand the word "employer" with "an expansive interpretation to effectuate the FLSA's broad remedial purposes." *Lambert v. Ackerley*, 180 F.3d 997, 1011–12 (9th Cir. 1999). Indeed, the definition in the FLSA has been called the "broadest definition that has ever been included in any one act." *United States v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945). At this stage, our question is one step removed from resolving the issue of misclassification (or other issues pertaining to liability and damages) — we must determine whether the TSPs that have opted in to the collective are "similarly situated" as to the key factual and legal issues.

All agree that in determining whether a person is an independent contractor or an employee under the FLSA, our court of appeals has identified a number of relevant factors "although the list is not exhaustive," including:

> (1) The degree of the alleged employer's right to control the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree of permanence of the working relationship; (6) whether the service rendered is an integral part of the alleged employer's business.

5

*Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981).[2]

"Neither the presence nor the absence of any individual factor is determinative. Whether an employer-employee relationship exists depends upon the circumstances of the whole activity and ultimately whether as a matter of economic reality, the individuals are dependent upon the business to which they render service." *Ibid.* (citations omitted).

Dynamex contends that the variations among TSPs preclude resolution of the central issue of alleged misclassification on a collective-wide basis. Dynamex also contends that even a finding that Dynamex misclassified each and every TSP would not demonstrate *liability* on a collective-wide basis, because liability could only be established upon a showing that the TSP received less than minimum wage in a week or received no overtime wages after the deduction of expenses for the week. Finally, Dynamex contends that issues such as the applicability of certain FLSA exemptions and the extent, if any, of each TSP's damages, would cause our case to become mired in individualized inquiries.

Plaintiffs counter that the issue of misclassification can be addressed for the collective as a whole, because four of the factors considered by the economic reality test — Dynamex's right to control TSPs, the permanence of the relationship, the integral nature of TSPs' work to Dynamex's business, and the need for special skills — can be evaluated based solely on Dynamex's policies, which can be established based on testimony from Dynamex's leadership and from the common terms of the agreements each TSP signed.

Plaintiffs further propose bifurcating our trial to address misclassification on a collective-wide basis and to address issues of ultimate liability for failure to pay overtime or minimum wages, including individualized defenses such as FLSA exemptions, and damages on an individual basis. Plaintiffs suggest the second phase could be conducted by a special master (although Dynamex has not consented to the use of a special master for that purpose).

---

[2] Throughout its briefs, Dynamex paraphrases, rather than quotes, *Donovan* and other decisions setting forth the economic-reality test. In each such instance, Dynamex describes the first factor as considering "the degree of control *exercised*," rather than the degree of the alleged employer's *right to control* (Defs.' Mtn. at 6, 17; Defs.' Reply at 4 n.3). Dynamex cites no authority for its sleight of hand.

Plaintiffs acknowledge that the extent of investments made by each individual TSP and his opportunity for profit and loss is subject to some variation. For example, some plaintiffs used their personal vehicles to perform delivery services on their own, others purchased a truck or hired a helper, still others purchased more than one truck and hired additional drivers as well as helpers. Nevertheless, Dynamex's uniform policies imposed the same level of constraints on TSPs' investments and opportunities for profit.

The facts of our case are similar to those in *Collinge v. IntelliQuick Delivery, Inc.*, No. 12-00824, 2015 WL 1292444, at *7 (D. Ariz. Mar. 23, 2015) (Judge John W. Sedwick). There, as here, a company that provided delivery services moved to decertify a collective of drivers asserting that they had been misclassified as independent contractors and bringing claims under the FLSA. The defendant there contended, as here, that variations regarding its actual control of the drivers, the opportunities for drivers' profit or loss, and the drivers' investment required decertification.

*Collinge* denied the motion for decertification, finding that the drivers were similarly situated with regard to the degree to which their managerial skills affected opportunities for profit or loss even though drivers could increase revenues by requesting additional work, arranging work efficiently, and reducing operating costs. The record showed that the defendant had not "deprived other drivers of these same opportunities." *Id.* at *6. *Collinge* acknowledged that drivers were not similarly situated with regard to their respective investments in equipment because they had made different decisions regarding the kinds of vehicles and accessories to purchase, but dismissed that variation as offering only minimal weight against decertification. Thus, *Collinge* denied the motion for decertification.

Although plaintiffs discuss *Collinge* at length in their opposition brief, Dynamex does not address the decision at all, much less attempt to distinguish it.

Indeed, in *Lee v. Dynamex, Inc.*, 230 Cal. App. 4th, 718, 723 (2014), Dynamex's TSPs won certification under California's class action standard for state law claims similar to the federal claims asserted herein. (Both parties have different counsel in the California action.) The certified class "contained four subclasses and several limited exclusions involving drivers

7

who had hired other drivers to perform services for Dynamex, worked for other companies while also driving for Dynamex or transported certain hazardous items or transported freight in interstate commerce." (The order certifying the class is currently pending review at the California Supreme Court.)

Our FLSA plaintiffs have not proffered sufficient information to craft ascertainable subclasses akin to those in *Lee*, but that was not its burden. Rather, to maintain this collective action, our plaintiffs simply needed to show, in light of the disparate facts and employment settings among our plaintiffs, Dynamex's varied and individualized defenses, and fairness considerations, that they remain similarly situated as to the core issues in our case.

On the core issues, Dynamex imposed uniform policies across all TSPs, and the bulk of our plaintiffs performed the same kind of work within the bounds set by Dynamex. Dynamex identified outliers with unique characteristics that might warrant a different conclusion on the issue of misclassification from the more typical opt-ins, but the presence of material differences among the opt-ins did not require decertification in *Collinge*, and Dynamex itself still faces a certified class action in *Lee v. Dynamex* addressing many of these very same variations. In accord with those decisions, the collective action will *not* be decertified at this stage, though the collective may become narrower, as now discussed.

Despite the Court's strong suggestion, the parties failed to agree on a trial plan that would facilitate efficiency by relying on the core commonalities among our plaintiffs while allowing Dynamex to present individualized defenses. Thus, the Court has crafted a trial plan.

We will have a two-phase proceeding. The first phase will primarily resolve the issue of misclassification, and the second will resolve any remaining issues concerning Dynamex's liability stemming from its misclassification and damages as to each individual.

In phase one, counsel for plaintiffs will first identify the single individual who presents, in counsel's view, the *strongest* case for misclassification (for example, a plaintiff with a single vehicle, no helpers, and who worked only for Dynamex for a substantial and regular period). As a condition of remaining part of this collective, all other plaintiffs will be required to agree in writing, after a notice to class members, to be bound by a judgment in favor of Dynamex as

8

to the selected plaintiff.  Any plaintiff's refusal to so agree will be construed as a concession that he or she is not similarly situated to the rest of the collective, and that plaintiff will be dismissed without prejudice accordingly.  (Dynamex, however, will be only partially estopped should it lose, as explained below.)

 Both sides will then be invited to move for summary judgment as to the selected plaintiff.  In addition to the core issue of misclassification, those motions should also address the issues of liability, damages, and any individualized defenses as to the selected plaintiff.

If Dynamex succeeds on summary judgment as to the misclassification issue as to the selected plaintiff, that result will bind the entire the collective.  The case will be over.  If the selected plaintiff succeeds on summary judgment as to misclassification, we will invite further motions for summary judgment (on the issue of misclassification only) from all other plaintiffs who contend their circumstances were materially identical to those of the initial plaintiff.  The Court will then apply collateral estoppel as allowed by law to the common issues shared between the initial selected plaintiff and the subsequent movants.

If summary judgment is denied as to the initial selected plaintiff, we will hold a jury trial on all issues pertaining to that individual.  Again, if Dynamex prevails as to misclassification, the entire collective will be bound by that result.  If the plaintiff prevails, we will entertain summary judgment motions in the same manner described above.  The special verdict form in the trial will be detailed enough to allow the follow-on plaintiffs to invoke collateral estoppel.

Importantly, this first phase will only address the threshold issue of misclassification (except as to the initial selected plaintiff, whose case will be entirely resolved in the initial proceedings of phase one).  Of course, misclassification can give rise to liability only to the extent a plaintiff also proves he received less than minimum wage or worked overtime without receiving premium compensation.  For follow-on claimants, those extra issues will be addressed in phase two, as well as damages.

To be sure, each follow-on plaintiff will still have to prove that he was subjected to the standard Dynamex regime, but it will have already been established via collateral estoppel that the regime is guilty of misclassification (assuming a plaintiff won in phase one).

9

In phase two, we will first invite another round of motions for summary judgment from both sides as to any plaintiff who had been deemed misclassified during phase one. The motions will address each plaintiff's claim for liability and damages and Dynamex's individualized defenses. If any case survives the phase two summary judgment motions due to fact issues, we will proceed to a series of individual trials to determine liability, damages, and individualized defenses. Both sides will be free to present any evidence that bears on the issues at trial, even that evidence was also relevant to misclassification. Each trial will largely consist of a review of Dynamex's and the plaintiff's financial records and timesheets and will likely take no more than a few hours. We will likely be able to complete two trials per day, and the same jury will hear as many cases as is practicable, then we will empanel a subsequent jury.

Pursuant to this plan, Dynamex will retain the opportunity to present each and every individualized circumstance bearing on misclassification and each plaintiff will benefit from each and every common circumstance among them. This extensive procedure will be preferable to decertifying the collective action and requiring each individual to pursue his or her claims, giving up on all the hard work that has already been done in our case.

It would be preferable if both sides consented to referring the second phase to a special master, but the Court is prepared for this undertaking absent any such agreement. The challenge of this procedure is far preferable to allowing the work that has gone into this case on behalf of the collective to go to waste.

This order acknowledges that the foregoing plan leaves open the possibility that several plaintiffs will remain a part of our collective although their circumstances may not be materially identical to those of the initial selected plaintiff (though they may nevertheless be sufficiently similarly situated to warrant some collective treatment). Moreover, several plaintiffs may have certain time periods in which their circumstances aligned with those of the initial selected plaintiff, and other time periods that did not. This order need not resolve how that problem will be handled at this stage except to say that several options remain available, including iterating the process with a new representative plaintiff or decertifying the collective as to any individual who could not establish misclassification in the first round.

The Court recognizes that the foregoing plan is unusual, even creative. But the fact is that eighty percent of the facts of this case are common to all and relatively easy to adjudicate. Dynamex has made hay out of the remaining twenty percent, emphasizing, if not exaggerating, the morass it says will emerge when we try the cases. We should not let that tail wag the dog, especially after all the work the Court has invested in this case, mostly at Dynamex's behest.

**CONCLUSION**

For the reasons stated above defendants' motion to decertify the collective action is **DENIED** and plaintiffs' motion to bifurcate is **GRANTED** (to the extent stated).

In writing, plaintiffs shall identify in a filing the single plaintiff who will be the subject of the first step of phase one by **OCTOBER 6 AT NOON** and shall propose a jointly agreed on notice to all collective members with a deadline for consent, which shall be after all the briefing on the initial summary judgment motions are completed, but before the motions are heard. There will be **NO EXCEPTIONS** for late submission of consent forms. A proposed template that counsel may start from is appended to this order. It is plaintiffs' counsel's burden to ensure all plaintiffs understand the procedure set forth above and the effect of consenting (or not) to be bound by the procedure.

Summary judgment motions as to the individual selected by plaintiff's counsel will be due on **OCTOBER 27**. The schedule for further motions will be set after the initial summary judgment motion is resolved.

The current trial dates are **VACATED**. A trial, if needed, as to the selected plaintiff is tentatively scheduled for **JANUARY 9**, with a final pretrial conference on **JANUARY 4 AT 2:00 P.M.**

Please do not move for reconsideration or "clarification." We are moving ahead with this case. With hard work, counsel are expected to help the Court bring this case to a fair conclusion rather than throw up road blocks.

**IT IS SO ORDERED.**

Dated: September 29, 2016.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE